UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Cause No. 1:11-CR-22-HAB |
| | ) | |
| JAMES THOMAS | ) | |

**OPINION AND ORDER**

On July 13, 2020, the Court received a letter from Defendant James Thomas requesting compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). (ECF No. 544). The letter was referred to the Federal Community Defender, who entered her appearance on July 29, 2020. The FCD filed a sealed motion on Defendant's behalf on August 13, 2020, in support of his request for compassionate release. (ECF No. 549). The Government filed its response in opposition on September 14, 2019. The deadline for filing a reply was September 21, 2020, and no reply was filed; however, the Court has observed that its is the FCD's practice not to file a reply. This matter is ripe for review.

**A.  Procedural History**

On May 25, 2011, Defendant was charged with two counts in an eight count superseding indictment with: Conspiracy to Distribute and Possess with Intent to Distribute Five Kilograms or More of Cocaine, in violation of 21 U.S.C. § 846, and; Possession with Intent to Distribute 500 Grams or More of Cocaine, in violation of 21 U.S.C. § 841(a)(1).

As the Government's response details, the charges stemmed from a multi-year investigation into an international drug conspiracy to import large amounts of cocaine into northeast Indiana from Mexico and to export the resulting profits back to Mexico. Thomas was not the leader of this conspiracy, but was nonetheless responsible for transporting money and

drugs, arranging large drug transactions, and distributing drugs into the community. At the time of his arrest, Defendant was found with pre-portioned, distribution quantities of methamphetamine, heroin, cocaine, and crack cocaine; more than $40,000.00 in cash; multiple firearms; and numerous pieces of drug dealing paraphernalia. Defendant admitted to his involvement in the conspiracy to federal agents.

As a result of his extensive criminal history, which involved two prior convictions for cocaine distribution, Defendant was deemed a career offender at sentencing. This gave Defendant a guideline sentencing range of 292 to 365 months. On March 19, 2015, Judge Theresa Springmann issued a Sentencing Opinion, evaluating the § 3553(a) factors in Defendant's case. Significantly for this matter, Judge Springmann wrote:

> On one hand, the Defendant has not shown any willingness to rehabilitate himself, and has an above average tendency to criminal activity in relation to his age. However, he is now 67 years old and suffers from seizures and high blood pressure. If he served a term of imprisonment at the low end of the Guideline range, he would be in his mid-80's when he was released. There is no reason to believe his health will improve during his time of incarceration. Moreover, by the time he is released from a lengthy prison sentence, his previous drug trafficking connections will have presumably dried up. The Guideline range does not take into account either the Defendant's age or his health problems.

(ECF No. 444 at 5).

After considering all the relevant sentencing factors, Judge Springmann sentenced Defendant to a term of 235 months' imprisonment. This amounted to a sentence 57 months below the guideline range. Defendant is currently serving his sentence at FCI Elkton. By Defendant's math, he has served approximately 113 months of his sentence.

**B.  Legal Analysis**

**1.  *Extraordinary and Compelling Circumstances***

Defendant's filings request a sentencing modification. Generally, a court is statutorily prohibited from modifying a term of imprisonment once imposed. *See* 18 U.S.C. § 3582(c). A handful of statutory exceptions exist, however, one of which permits the court to reduce a sentence based on a retroactively applicable amendment to the sentencing guidelines that lowers the defendant's guideline range. 18 U.S.C. § 3582(c)(2). Another allows a court to grant an inmate compassionate release if the inmate meets certain requirements. *See* 18 U.S.C. § 3582(c)(1)(A).

Defendant seeks compassionate release pursuant to § 3582(c)(1)(A). Under this provision, a court may not modify a term of imprisonment except that –

(1) in any case --

> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, . . . finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction …
>
> … and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A)(i).

Because Defendant, not the Director of the BOP, filed the motions, he must first demonstrate that he meets the statutory exhaustion requirement to proceed further. The Government concedes that Defendant requested release from his warden, that the request was denied, and that more than thirty days have elapsed since the denial. Therefore, the Court finds that administrative remedies have been exhausted in this case.

Defendant identifies several medical conditions that, in addition to his advanced age (72), he claims amount to extraordinary and compelling reasons for his release. Defendant suffers from malignant neoplasm in the colon, colon polyps, seizure disorder, hypertension, anemia, benign hypertrophy of the prostate, sickle cell trait, bladder neck obstruction, disorder of muscle, hyperlipidemia, and gastro-esophageal reflux.

Congress did not define "extraordinary and compelling reasons" in the statute, instead delegating the matter to the Sentencing Commission to promulgate a policy statement that "describe[s] what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t). The policy statement, contained in United States Sentencing Guidelines ("U.S.S.G.") § 1B1.13 and the accompanying Application Notes, in line with the statutory directive in § 3582(c)(1)(A), requires a court to make several findings.

First, the court must address whether "[e]xtraordinary and compelling reasons warrant the reduction" and whether the reduction is otherwise "consistent with this policy statement." U.S.S.G. § 1B1.13(1)(A), (3). To this end, a court is to consider the medical condition of the defendant, his age, his family circumstances, and whether there exists in the defendant's case an extraordinary or compelling reason "other than or in combination with" the other reasons described in the Application Notes. Second, the Court must determine whether the defendant is "a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). Finally, the Court must consider the § 3553(a) factors, "to the extent they are applicable." U.S.S.G. § 1B1.13.

Additionally, when the defendant moves for a reduction based on COVID-19, Courts have also considered: (1) the specificity of the defendant's COVID-19 concerns, (2) whether the

defendant has a medical condition that makes him especially susceptible to the dangers of COVID-19, and (3) the extent that the defendant's release would mitigate or aggravate the COVID-19 pandemic. *United States v. Barrett*, No. 2:17-CR-1, 2020 WL 3264112, at *3 (N.D. Ind. June 17, 2020); *see also United States v. Davis*, No. 2:19-CR-74-3, 2020 WL 1951652, at *1–2 (N.D. Ind. Apr. 23, 2020) (applying similar factors to consider whether there was a "compelling reason" for pretrial release due to the COVID-19 pandemic). In the context of the COVID-19 pandemic, "§ 3582(c)(1)(A) contemplates a sentence reduction for specific individuals based on the individuals' particular circumstances of where he is housed and his personal health conditions." *United States v. Melgarejo*, No. 12-cr-20050, 2020 WL 2395982, at *3 (C.D.Ill. May 12, 2020).

The Court recognizes that Defendant suffers from several maladies that either do or may expose him to the risk of serious complications should he contract COVID-19. Defendant's cancer history, his age, and his weight have all been found by the CDC to result in a greater risk of COVID complications. *See* Center for Disease Control, *Coronavirus Disease 2019, People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. His hypertension and neurologic conditions might expose him to those complications. *Id*. The Government does not argue otherwise.

However, there is no indication that the BOP has failed to adequately treat any of Defendant's medical conditions. Following his cancer diagnosis and surgery, Defendant received regular colonoscopies from BOP doctors. There is no evidence that Defendant has suffered any ongoing problems as a result of his past cancer diagnosis. Defendant notes that he has not received a follow up colonoscopy in almost a year, his last procedure having been cancelled because of COVID. While that is clearly suboptimal, it is not just the BOP where routine care has suffered as a result of the pandemic. Rather, adults across the country have postponed or skipped medical care

5

because of COVID. *See* Bruce Jaspen, Half of U.S. Adults Skipping Healthcare During Pandemic, Forbes, https://www.forbes.com/sites/brucejapsen/2020/05/27/poll-nearly-half-of-us-adults-skipping-care-amid-pandemic/#6e65797d2273. Thus, it is unlikely that Defendant would have received any better health care were he not in the BOP. Defendant does not identify any other condition that he claims has not been adequately treated.

The Court also recognizes that Defendant is housed at FCI Elkton, where earlier this year conditions deteriorated to the point that the United States District Court for the Northern District of Ohio ordered the BOP to identify medically vulnerable individuals and expedite their transfer from the facility, either to another facility or supervised release. *See Wilson v. Williams*, 2020 WL 1940882 (N.D. Ohio April 22, 2020), *vacated*, 961 F.3d 829 (6th Cir. 2020). Since the beginning of the outbreak, FCI Elkton has reported 946 positive tests[1], the second most of all the facilities in the BOP. While the facility only reports 4 active cases among inmates and 2 among staff as of the date of this Opinion[2], it is unclear whether that is the result of any action taken by the BOP or simply the result of the virus having run through all its potential hosts. In any event, there is nothing about FCI Elkton's handling of the outbreak to date that leaves the Court with any confidence that it could handle a future flare up of COVID-19. *See, Melgarejo*, 2020 WL 2395982, at *3 ("[A] prisoner [may] satisfy the extraordinary and compelling reasons requirement by showing that his particular institution is facing a serious outbreak of COVID-19 infections, the institution is unable to successfully contain the outbreak, and his health condition places him at significant risk of complications should he contract the virus.").

However, Defendant has managed to live through the worst of times at FCI Elkton without contracting the virus. This shows that, even when the virus was running wild through the facility,

---

[1] https://www.bop.gov/coronavirus/
[2] *Id.*

it was possible to avoid infection. Cases are down precipitously now, and any future outbreak is speculative. Whatever specter the phrase "FCI Elkton" once carried is significantly diminished now.

**2.**     *§ 3553(a) Factors*

Regardless of how the Court came down on the "extraordinary and compelling reasons" analysis, it would find that the § 3553(a) factors overwhelmingly support Defendant's continued incarceration. In reaching this conclusion, the Court reaches back to the analysis of Judge Springmann in her Sentencing Opinion. There, Defendant's age and health were taken into consideration, and a term of 235 months was handed down. While this was a significant departure from the guidelines, one must still be mindful that Defendant, then 64, received a nearly twenty-year sentence. There is nothing in the Sentencing Opinion or the actual sentence that indicates that Judge Springmann intended anything else other than for Defendant to serve his remaining days in federal custody. True, she could not have anticipated COVID when she handed down the sentence, but her decision to incarcerate Defendant into his eighties speaks loudly to her intent.

Even without that intent, the Court would reach the same conclusion. Defendant is an unrepentant recidivist, an individual that has devoted the entirety of his adult life to flooding the streets with cocaine. This is Defendant's third lengthy incarceration for cocaine distribution and the Court finds no reason to believe that releasing him now, less than halfway through his sentence, would provide the rehabilitation or deterrence that the prior incarcerations did not. Given the severity of his offense conduct and his characteristics, the Court finds that his original sentence remains sufficient but not greater than necessary to serve the purposes of sentencing.

**C.     Conclusion**

For the foregoing reasons, Defendant's request for compassionate release (ECF No. 549) is DENIED.

SO ORDERED on September 22, 2020.

                                               s/ *Holly A. Brady*
                                               JUDGE HOLLY A. BRADY
                                               UNITED STATES DISTRICT COURT

!